United States Bankruptcy Court
Southern District of Texas

**ENTERED**

May 18, 2026

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 24-33353** |
| **BARROW SHAVER RESOURCES** | § | |
| **COMPANY, LLC,** | § | **CHAPTER 11** |
| | § | |
| Debtor. | § | |
| | § | |
| **RAYMOND KASINO,** *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 25-3440** |
| | § | |
| **BARROW SHAVER RESOURCES** | § | |
| **COMPANY, LLC,** | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION GRANTING IN PART
## AND DENYING IN PART MOTIONS
## FOR SUMMARY JUDGMENT
## (RELATES TO ECF NOS. 19 & 89)

Barrow Shaver Resources Company, LLC (hereinafter the "Debtor"), and Raymond Kasino and LaWanda Turner (hereinafter the "Plaintiffs") both move for summary judgment on several issues relating to ownership over certain overriding royalty interests (also referred to as "ORRIs").

For the reasons stated below, the Court finds:

1.  The Consulting Agreements do not identify the Plaintiffs' alleged ORRIs with reasonable certainty as to satisfy the Texas statute of frauds.

2.  The Court reserves judgment on the issue of whether the Plaintiffs are owners of the alleged ORRIs, as neither Party

1 / 48

sufficiently addressed the issues of (i) whether certain of the alleged ORRIs are excepted from the statute of frauds, and (ii) whether the Parties' course of conduct prevents enforcement of certain contractual provisions within the Consulting Agreements.

3. The Consulting Agreements contain sufficient present intent to convey the alleged ORRIs as to satisfy the Texas statute of conveyances, both with respect to ORRIs allegedly conveyed pre and post execution of the contract.

4. To the extent any ORRIs may have been conveyed, those ORRIs are not excluded from the Debtor's property of the estate under § 541(b)(4)(A) because the Consulting Agreement is not a farmout agreement within the meaning of § 101(21A).

5. To the extent any ORRIs may have been conveyed, the Plaintiffs retain an equitable interest in those ORRIs excluded from the Debtor's property of the estate under § 541(d).

6. To the extent any ORRIs may have been conveyed, the trustee as a hypothetical purchaser or lien creditor would be on inquiry notice of those ORRIs and therefore the Plaintiffs' interests are not avoidable under §§ 544(a)(1) or (a)(3).

7. To the extent any ORRIs may have been conveyed, under the terms of the Consulting Agreement those ORRIs, and subsequent production revenues paid to the Plaintiffs within two years of the Involuntary Petition Date were transferred for reasonably equivalent value, and therefore those transfers are not avoidable under § 548(b)(1)(a) nor TEX. BUS. & COM. CODE § 24.005(a)(2).

## BACKGROUND

The Debtor is an independent oil and natural gas company focused on the exploration, development, production, and acquisition of crude oil and natural gas from properties in Southeast Texas, East Texas, and West Texas.[1] The Debtor was formed in mid-1989 with Scott

---

[1] Case No. 24-33353, ECF No. 63 at ¶ 11.

O. Shaver (hereinafter "Mr. Shaver") and Thomas D. Barrow as original owners.[2]  The Debtor's headquarters is located in Tyler, Texas.[3]

The Debtor is (or was) the lessee under certain oil and gas leases and operator under certain joint operating agreements pertaining to oil and gas prospects in the areas of Morris, Cass, Upshur, and Camp Counties, Texas (hereinafter the "Hidden Rock Field").[4]  The Debtor's approach to identifying oil and gas prospects involved first identifying a potential prospect for the exploration and development of hydrocarbon production, and once identified, initiating a leasing program to acquire acreage that covers the prospect.[5]  Prior to initiating the leasing program, the Debtor would form a joint venture with other investors who were interested in developing the prospect and would execute exploration agreements with those investors outlining how the parties hoped to develop the prospect.[6]  Regardless of the exploration agreement, the Debtor generally sought to retain flexibility in developing the prospect, including, namely, the authority to revise the overall net revenue interest (hereinafter the "NRI") in the prospect to make it more valuable for a potential buyer.[7]

In 2017, the Debtor entered into that certain exploration agreement, dated as of December 22, 2017, with certain investors that governed the development of the Hidden Rock Field (hereinafter the "Exploration Agreement" or "EA").[8]  Under the EA, the Debtor was required to deliver an average 77% NRI to investors, while reserving the potential for ORRI (hereinafter the "BSR ORRI").[9]  Pursuant to the EA, the Debtor's potential BSR ORRI could fluctuate based on how certain leases with lessor royalty interests, ORRIs, net profit interests, carried interests, or other burdens affected the overall average NRI on the entire prospect.[10]  In simple terms, the BSR ORRI was only available to

---

[2] *Id.*

[3] *Id.*

[4] *Id.* at ¶ 24; ECF No. 110-4 at ¶¶ 13–19.

[5] ECF No. 110-1 at 3–4.

[6] *Id.*

[7] *Id.*

[8] ECF No. 110-5.

[9] *Id.* at 6–7.

[10] *Id.*

the Debtor if the overall average NRI on the entire prospect left enough of a difference between the average NRI and the required 77% NRI to make "room" for that interest, after taking into account total working interests, lessor's royalty interests, and other burdens for each of the Debtor's leases.[11]

At the time the Debtor entered into the EA with its investors, the Debtor only had approximately 15,165 net mineral acres in the Hidden Rock Field, with plans on increasing the acreage to 40,000.[12]  The Debtor continued to acquire and extend its leases from 2017 up until July 23, 2024, the date on which an involuntary petition for Chapter 7 bankruptcy was filed against the Debtor (hereinafter the "Involuntary Petition Date").[13]   In conjunction with the Debtor's attempts to raise financing to develop the Hidden Rock Field, it solicited term sheets with numerous counterparties whereby the Debtor *inter alia* offered to convey an ORRI as part of the proposed financing arrangements.[14]  The potential conveyance of those ORRIs may have impacted the average NRI of the entire prospect, and consequently the room available for the BSR ORRI.[15]   Prior to the Involuntary Petition Date, however, the Debtor never entered into any of those proposed financing arrangements.[16]

Prior to its eventual bankruptcy, the Debtor employed Raymond Kasino (hereinafter "Mr. Kasino") and James Turner[17] (hereinafter "Mr. Turner," and together with Mr. Kasino, the "Consultants"), two geologists who were involved in drilling, reworking, testing, and similar operations with respect to the Debtor's business.[18]  On June 13, 2019,

---

[11] *Id.*

[12] *Id.* at 2.

[13] Case No. 24-33353, ECF No. 1.  The Debtor would later consent to an order converting its involuntary Chapter 7 bankruptcy into a voluntary Chapter 11 proceeding.  Case No. 24-33353, ECF Nos. 47, 49.

[14] ECF No. 110-3 at 73 ¶¶ 1–4; *see e.g.* ECF No. 110-8 at 2–3 (example term sheet proposed with counterparty PGIM).

[15] ECF No. 110-4 at 69 ¶ 20–74 ¶ 15.

[16] ECF No. 110-3 at 110 ¶¶ 14–25.

[17] LaWanda Turner filed this adversary proceeding on behalf of Mr. Turner's estate, claiming an interest in ORRIs Mr. Turner allegedly earned pursuant to the Consulting Agreements.  ECF No. 1.  Mr. Turner passed away on March 31, 2024.

[18] ECF No. 89-1 at 53 ¶¶ 12–24.

the Debtor entered into identical and respective consulting agreements (hereinafter the "Consulting Agreement") with the Consultants whereby each geologist agreed to "identify, generate, and evaluate various prospects for the exploration and development of oil and gas prospects for the exploration and development of oil and gas reserves" (defined as "Prospects") for the Debtor.[19]  Pursuant to the Consultant Participation Program as described in the Consulting Agreement, in exchange for and as additional compensatory incentive for the Consultants to develop Prospects, the Debtor agreed to "set aside" for the Consultants either:

> *A maximum [ORRI] not to exceed one percent (1%) of 8/8ths out of the overriding royalty interest which [the Debtor] earns or retains with respect to the Prospect, effective as of the time such ORRI is earned by [the Debtor], provided that, the lease burdens and deal terms allow for a 1% ORRI; or

> *If ORRI of least [*sic*] one percent (1%) is not available under deal terms, Consultant will earn 50% of whatever ORRI [the Debtor] earns or retains.[20]

The Consulting Agreement also provides the Consultants were eligible to receive a "cash bonus," "at the time of a sale of a project or well(s)", "in the Debtor's discretion, to be as fair and reasonable as the sale terms permit."[21]  The Consulting Agreement states "record title to the underlying oil and gas properties . . . shall at all times remain in the name of [the Debtor], so long as [the Debtor] is the operator of the property."[22]  The Debtor's internal documents indicate each of the Consultants may have been orally conveyed a number of ORRIs and working interests throughout the course of their employment with the Debtor.[23]  Information taken from the Debtor's pay decks also indicate the Consultants and Plaintiffs were receiving production revenues on account of a number of those ORRIs and working interests during their

---

[19] ECF No. 110-13; ECF No. 90-1.

[20] ECF No. 110-13.

[21] *Id.*

[22] *Id.*

[23] ECF No. 2-2; ECF No. 2-3; ECF No. 11-1; ECF No. 11-2; ECF No. 20.

employment and prior to the Involuntary Petition Date.[24]  On or around July, 2024, the Debtor stopped paying the Plaintiffs production revenues associated with their alleged mineral interests.

On August 22, 2024, the Court entered the Interim Order (I) Authorizing the Debtor to Pay or Apply Payments Attributable to Mineral Interests in the Ordinary Course and (II) Granting Related Relief (hereinafter the "Mineral Interests Interim Order").[25]  Pursuant to the Mineral Interests Interim Order, the Debtor was authorized but not directed to pay outstanding pre and post-petition royalty interests to certain Royalty Interest Holders, ORRI Holders, and Working Interest Holders on a go-forward basis, except for certain "Restricted Persons" not including the Plaintiffs.[26]  On September 30, 2024, the Court entered the Final Order (I) Authorizing the Debtor to Pay or Apply Payments Attributable to Mineral Interests in the Ordinary Course and (II) Granting Related Relief (hereinafter the "Mineral Interests Final Order"), granting similar relief on a final basis.[27]  Despite entry of the Mineral Interests Interim and Final Orders, the Debtor refused to resume paying production revenues to the Plaintiffs on account of their alleged mineral interests.

On July 11, 2025, one year into the Debtor's bankruptcy, the Plaintiffs filed the instant adversary proceeding seeking declaratory judgment as to ownership of certain alleged ORRIs and working interests each Consultant purportedly earned during their involvement and employment with the Debtor, and pursuant to the Consulting Agreement.[28]  The Plaintiffs also sought a temporary restraining order against the Debtor, requesting that the certain suspended production revenues generated on account of the Plaintiffs' alleged ORRIs and working interests be escrowed into a segregated account by the Debtor.[29]

---

[24] ECF No. 89-1 at 129 ¶¶ 11–25, 130 ¶¶ 1–25, 131 ¶¶ 8–25.

[25] Case No. 24-33353, ECF No. 101.

[26] *Id.*

[27] Case No. 24-33353, ECF No. 237.

[28] ECF No. 1.

[29] *Id.*

On August 13, 2025, the Debtor filed its Answer and Affirmative Defenses to Complaint for Declaratory Judgment and Application of Temporary Restraining Order and Preliminary Injunction and Counterclaims (hereinafter the "Counterclaim").[30]  In its Counterclaim, the Debtor asserted claims for declaratory judgment as to ownership of the Plaintiffs' alleged ORRIs, unjust enrichment as to the value of certain pre-petition production revenues paid to the Plaintiffs on account of their alleged ORRIs, constructive fraudulent transfer as to the same, avoidance of any alleged transfer of the claimed ORRIs as a bona fide purchaser under the Bankruptcy Code and applicable Texas law, objection and disallowance of the Plaintiffs' proofs of claim in the Debtor's bankruptcy proceeding, recovery of avoided ORRIs, and attorney's fees.[31]  On September 10, 2025, the Plaintiffs filed an Answer to the Debtor's Counterclaim.[32]

On October 3, 2025, the Debtor filed the instant Motion for Summary Judgment (hereinafter the "Debtor's MSJ"), seeking summary judgment as to the issues of (i) whether the alleged ORRIs were validly conveyed to the Plaintiffs under Texas law, (ii) whether the trustee has the status of a bona fide purchaser or hypothetical lien creditor without notice of the Plaintiffs' alleged ORRIs, and (iii) whether the Plaintiffs are initial or immediate transferees within the meaning of the trustee's recover power under § 550(a)(2).[33]

On October 14, 2025, the Debtor filed the Opposed Motion for Leave to File an Amended Counterclaim, with a copy of its Amended Counterclaim (hereinafter the "Debtor's Amended Counterclaim") attached as Exhibit A.[34]

On November 10, 2025, the Court held a Hearing on the Plaintiffs' request for a temporary restraining order and preliminary injunction.[35] On November 18, 2025, the Court issued an oral ruling granting the

---

[30] ECF No. 11.
[31] *Id.*
[32] ECF No. 15.
[33] ECF No. 19.
[34] ECF No. 24; ECF No. 24-1.
[35] ECF No. 53.

Plaintiffs' request for a temporary injunction and ordering the Parties to settle a form of order consistent with the Court's ruling on the record.[36]  On November 21, 2025, the Court enter the Order Granting Debtor's Opposed Motion for Leave to File an Amended Counterclaim.[37] On December 4, 2025, the Court entered the Plaintiffs' Proposed Order after the TRO Hearing, ordering that the suspended production revenues on account of the Plaintiffs' alleged ORRIs and working interests be escrowed into a segregated account.[38]  In the order the Court did not make any final determination as to whether the alleged ORRIs or working interests existed, whether any agreement to create the mineral interests was enforceable, whether the Plaintiffs retained such interests, whether such interests were avoidable, or whether such interests were property of the Debtor's estate.[39]

On January 26, 2026, the Plaintiffs filed a Response to the Debtor's MSJ.[40]  That same day, the Plaintiffs filed their own Motion for Summary Judgment (hereinafter "Plaintiffs' MSJ"), seeking summary judgment as to the issues of (i) whether the Plaintiffs are owners of the alleged ORRIs, (ii) whether the alleged ORRIs are property of the Debtor's estate under §§ 541(b)(4) or 541(d), (iii) whether the trustee can avoid the Plaintiffs' alleged ORRIs as a bona fide purchaser or hypothetical lien creditor without notice, and (iv) whether the alleged conveyance of the ORRIs and subsequent production revenues were arms'-length transfers for reasonably equivalent value.[41]

On March 16, 2026, the Debtor filed its Response to the Plaintiffs' MSJ.[42]  On March 18, 2026, both Parties filed a respective Reply to each MSJ.[43]  That same day, the Court held a Hearing on the cross MSJs,

---

[36] ECF No. 68.
[37] ECF No. 73.
[38] ECF No. 80.
[39] *Id.*
[40] ECF No. 86.
[41] ECF No. 89.
[42] ECF No. 110.
[43] ECF No. 112; ECF No. 113.

where it heard oral argument on the motions and took both matters under advisement.[44]

## JURISDICTION & LEGAL STANDARD

28 U.S.C. § 1334(a) provides the District Courts with jurisdiction over this proceeding. 28 U.S.C. § 157(b)(1) states that "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This proceeding has been referred to this Court under General Order 2012-6 (May 24, 2012). This Court has jurisdiction in this proceeding as it is a core proceeding which the Court can consider under 28 U.S.C. §§ 157(b)(2)(A), (B), (C), (H) and (K). The Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). And venue is proper under 28 U.S.C. §§ 1408 and 1409.

Under FED. R. CIV. P. 56, as incorporated into this adversary proceeding through FED. R. BANKR. P. 7056, a movant is entitled to summary judgment if it demonstrates to the Court "there is no genuine dispute as to any material fact and [the movant] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute pertaining to a material fact is "genuine" if the evidence is such that a reasonably jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there is a disputed material fact precluding summary judgment, "courts [] consider the evidence in the light most favorable to the nonmovant, yet the nonmovant may not rely on mere allegations in the pleadings; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial." *Spivey v. Robertson*, 197 F.3d 772, 774–75 (5th Cir. 1999) (citing *Anderson*, 477 U.S. at 248–49). "[U]nsubstantiated assertions are not competent summary judgment evidence." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*

---

[44] ECF No. 114.

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonably juror could find for the nonmovant, summary judgment will be granted."  *Id.* (citing *Celotex Corp.*, 477 U.S. at 322).

**DISCUSSION**

The legal framework structuring the Parties' cross MSJs largely mirror one another and present three overarching issues: first, whether the Plaintiffs are owners of ORRIs; second, whether the Plaintiffs' interests in the alleged ORRIs are excluded from the Debtor's property of the estate under § 541; third, whether the Debtor can avoid the Plaintiffs' alleged interests in the ORRIs under either §§ 544 or 548 and recover those interests under § 550.  Each of these major disputes presents various sub-issues that will be addressed in turn.

For the reasons stated below, both Parties' MSJs are granted in part and denied in part.

## I.    WHETHER THE PLAINTIFFS ARE OWNERS OF ORRIS.

According to the Plaintiffs, a conveyance of real property can be effective even without the formalities of a deed, as long as (i) the grantor and grantee are identifiable, (ii) the intent to convey title of real property interests is identifiable, and (iii) the instrument is signed and acknowledged by the grantor.[45]  The Plaintiffs argue each of these elements is present in the Consulting Agreement, and therefore that instrument effectively conveys to the Plaintiffs each of their claimed ORRIs.[46]

The Debtor argues that the Plaintiffs misconstrue the requirements necessary to effectuate the conveyance of real property interests under Texas law.[47]  The Debtor argues the Consulting Agreement fails to convey the Plaintiffs' alleged ORRIs because the instrument fails to satisfy the requirements of the Texas statute of

---

[45] ECF No. 86 at ¶¶ 24–27; ECF No. 89 at ¶¶ 26–29.
[46] ECF No. 86 at ¶¶ 24–27; ECF No. 89 at ¶¶ 26–29.
[47] ECF No. 110 at ¶¶ 22–25; ECF No. 112 at ¶¶ 2–5.

frauds and the Texas statute of conveyances.[48]   With respect to the statute of frauds, the Debtor argues that requirement is not satisfied because the Consulting Agreement does not identify with reasonable certainty the property within which the Plaintiffs claim ORRIs in.[49] With respect to the statute of conveyances, the Debtor argues the Consulting Agreement lacks a present intent to convey ORRIs because the language of the agreement contemplates contingent and future conduct which is insufficient to evidence a complete land transaction.[50]

Oil and gas interests are real property interests governed by applicable Texas state law.  *See Piranha Partners v. Neuhoff*, 596 S.W.3d 740, 742 n.2 (Tex. 2020) (citing *Gruss v. Cummins*, 329 S.W.2d 496, 501 (Tex. Civ. App.–El Paso 1959, writ ref'd n.r.e.) ("one of the most essential elements of a contract for the conveyance of such an overriding royalty interest is a description of the lease from which it comes; for it is the lease which denotes the life and breadth of the estate to be assigned.")). Under Texas law, a "valid conveyance of an interest in land 'must satisfy the requirements of both the statute of conveyances, [TEX. PROP. CODE § 5.021], and the statute of frauds, [BUS. & COM. CODE § 26.01]." *ConocoPhillips Co. v. Hahn*, 704 S.W.3d 515, 530 (Tex. 2024) (citing *Gordon v. W. Houston Trees, Ltd.*, 352 S.W.3d 32, 43 (Tex.App.–Houston [1st Dist.] 2011, no pet.)).  "Otherwise, 'it is not necessary to have all the formal parts of a deed formerly recognized at common law or to [include] technical words.'" *Id.* (citing *Harlan v. Vetter*, 732 S.W.2d 390, 392 (Tex. App.–Eastland 1987, writ ref'd n.r.e.)).

Texas courts have stated the "following elements are generally required for a deed to accomplish a legally effective conveyance: (i) the instrument of conveyance is in writing; (ii) the interest to be conveyed is sufficiently described; (iii) the grantor and grantee can be ascertained from the instrument as a whole; (iv) there are operative words or words of grant showing an intention by the grantor to convey title to a real property interest to the grantee; (v) the instrument is properly signed and acknowledged by the grantor; and (vi) the instrument is delivered

---

[48] ECF No. 19 at ¶ 19; ECF No. 110 at ¶ 23; ECF No. 112 at ¶ 3.

[49] ECF No. 19 at ¶¶ 15–16; ECF No. 110 at ¶¶ 26–30; ECF No. 112 at ¶¶ 6–10.

[50] ECF No. 110 at ¶¶ 33–37; ECF No. 112 at ¶¶ 13–14.

to and, if necessary, accepted by the grantee." *Id.* at 531–32 (internal citations omitted).

Here, the Consulting Agreement is in writing, the Debtor as grantor and the respective Consultants as grantees can be ascertained from the instrument as a whole, the instrument is properly signed and acknowledged by the Debtor as grantor, and the instrument was delivered to and accepted by the Plaintiffs.[51]   Accordingly, the Consulting Agreement satisfies elements one, three, five, and six for effectuation of a valid conveyance under Texas law and the Parties do not appear to dispute this.  The Parties' arguments hinge on elements two (sufficient description) and four (intent to convey).  Each issue will be addressed in turn.

### A.   Whether the Alleged ORRIs Are Sufficiently Described in the Consulting Agreement as to Satisfied the Statute of Frauds.

The Debtor in each of its papers raised the argument that the Consulting Agreement's purported conveyance of ORRIs to the Plaintiffs is unenforceable because it violates the Texas statute of frauds.[52] According to the Debtor, the Consulting Agreements vaguely reference "oil and gas [properties]" and "Prospects" within which the Plaintiffs ORRIs allegedly exist, but do not identify any lease from which the alleged ORRIs are derived, nor contain any description of any land of as to identify where the ORRIs exist with reasonable certainty.[53]  The Debtor also argues that the purported conveyances are unenforceable because the Consulting Agreements do not specify whether the Plaintiffs' interests are fixed or floating, nor whether the interests are a fraction of total production or a fraction of the total royalty interest.[54]

---

[51] ECF No. 110-13.

[52] ECF No. 19 at ¶¶ 16–20; ECF No. 110 at ¶¶ 31–32; ECF No. 112 at ¶¶ 6–10.

[53] *See supra* note 52.

[54]  ECF No. 19 at ¶ 18.  With respect to the Debtor's assertion that the Consulting Agreements must specify whether the Plaintiffs' alleged ORRIs are fixed or floating, and must specify the corresponding fraction of those interests, those arguments are misplaced.  *Pacer Energy, Ltd. v. Endeavor Energy Res., LP* does not stand for the proposition that an ORRI may only be conveyed if the conveyance instrument determines whether the interest is fixed or floating, but rather rearticulates the rules governing the distinction between those two types of interests

The Debtor argues that other documents which purportedly identify the property where the ORRIs exist are not signed by the Debtor and are therefore ineffective to convey ORRIs under the statute of frauds as well.[55]  Finally, and specifically with respect to Mr. Turner, the Debtor points out that the Consulting Agreement states no ORRIs are payable after the death of a Consultant, except for those already assigned, and reiterates its position that no ORRIs were assigned to Mr. Turner prior to his death based on violation of the statute of frauds.[56]

The Plaintiffs do not address the Texas statute of frauds in any of the papers they filed across both summary judgment motions.[57]  Rather, the Plaintiffs' argument that the ORRIs were effectively conveyed pursuant to the Consulting Agreement relies on the proposition of law taken from *Masgas v. Anderson* that the conveyance of real property can be effective without the formalities of a deed, as long as (i) the grantor and grantee are identifiable, (ii) the intent to convey title of real property interests is identifiable, and (iii) the instrument is signed and acknowledged by the grantor.[58]  310 S.W.3d 567 (Tex. App.–Eastland 2010, pet denied).  The Court has concluded no facts are disputed as to the Debtor and Plaintiffs being identifiable as grantor and grantee, and the Consulting Agreements being signed and acknowledged by Mr. Shaver as agent for the Debtor.[59]  The intent-to-convey element will be addressed *infra*.[60]  Regardless of these conclusions, however, the Debtor is correct that the Plaintiffs misconstrue the requirements for the valid conveyance of real property interests such as the ORRIs.  The Plaintiffs' proposition from *Masgas* does not dispense with the remaining

---

where a mineral interest has been conveyed.  675 S.W.3d 390, 394 (Tex. App.–Eastland 2023, pet. filed); *see also U.S. Shale Energy II, LLC v. Laborde Prop., L.P.*, 551 S.W.3d 148, 152 (Tex. 2018) ("[A royalty interest] *may* be conveyed or reserved in two ways," in the context of disputes regarding the *nature* of the interest conveyed.).  Indeed, *Pacer Energy* involved a dispute between two parties regarding the nature of royalty interests both parties agreed had been conveyed.  *Pacer Energy, Ltd.*, 675 S.W.3d at 394.

[55] ECF No. 19 at ¶¶ 18–19.

[56] *Id.* ¶ 19.

[57] ECF No. 1; ECF No. 86; ECF No. 89; ECF No. 113.

[58] ECF No. 86 at ¶ 25; ECF No. 89 at ¶ 27.

[59] *See supra* note 51; ECF No. 110-13.

[60] *See infra* notes 78–89.

requirements that the Texas statute of conveyances and statute of frauds must also be satisfied.  *See ConocoPhillips Co.*, 704 S.W.3d at 531–32.   Indeed, the court in *Masgas* cited the Texas statute of conveyances when reciting the requirements for a conveyance of real property but never made any articulations of law with respect to the requirements under the statute of frauds.  310 S.W.3d at 570.  Therefore, this Court does not read *Masgas* as proposing that the independent requirements under the statute of frauds are obviated even where the statute of conveyances is otherwise satisfied.  *Id.*

It is true this Court made preliminary and contingent legal determinations at the TRO Hearing—specifically on Plaintiffs' likelihood of success on the merits—relying on the Plaintiffs' cited proposition of law from *Masgas*.[61]  Plaintiffs, however, in the face of the Debtor's detailed and extensive briefing of the applicable law regarding the statute of frauds never once directly addressed the question, nor explained why those requirements should otherwise be dispensed of.[62] To be sure, the statute of frauds does govern the purported conveyances of the ORRIs, regardless of this Court's ruling at the TRO Hearing or Plaintiffs' cited proposition from *Masgas*.

In accordance with the statue of frauds, the Consulting Agreement "must furnish within itself, or by reference to some other existing writing, the means or data by which the [property] to be conveyed may be identified with reasonably certainty."  *Long Trs. v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) (quoting *Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972)); BUS. & COM. CODE § 26.01(a), (b)(4). "Knowledge and intent of the [P]arties will not give validity to the contract."  *Morrow*, 477 S.W.2d at 540 (citing *Rowson v. Rowson*, 275 S.W.2d 468, 470 (Tex. 1955)).  The Consulting Agreement does not contain the location or legal description of any lease pertaining to any relevant ORRI having been allegedly earned or conveyed to the Plaintiffs, nor is any property reasonably identifiable from the text of the instrument.[63]  Therefore, the Consulting Agreement on its face is

---

[61] ECF No. 89-6 at 5 ¶¶ 18–25, 6 ¶¶ 1–2.

[62] *See supra* note 57.

[63] ECF No. 110-13.

legally deficient to satisfy the statute of frauds, and the Plaintiffs cannot rely on that instrument to effectuate a conveyance of the ORRIs. Instead, various other documents purportedly identify the ORRIs.[64]

### (1)    Alleged ORRIs With a Location or Legal Description in Division Orders or Division of Interest Listings.

The Consulting Agreement provides the Debtor "has agreed to set aside, for the Consultant [an ORRI] . . . out of the overriding royalty interest which [the Debtor] earns or retains with respect to the Prospect."[65]  The language of the Consulting Agreement cabins the undefined term "Prospect" within the broader term "oil and gas properties."[66]  "Oil and gas properties" is, however, similarly undefined, leaving the Consulting Agreement on its face legally deficient to effectuate a valid conveyance of any identifiable properties.[67]  Certain ORRIs have referrable locations and legal descriptions enumerated in respective division orders—a document signed only by the purported owner, which purportedly represents a manifestation as to their ownership of the given interest in the relevant lease listed therein (hereinafter the "Division Order")—or the division of interest listing for each owner (hereinafter the "Division of Interest Listing")—an internal record profiling each of the purported ownership interests an owner has in each respective lease of the Debtor.[68]  The issue becomes whether evaluation of the Division Orders and Division of Interest Listings as relevant extrinsic evidence to identify the location of the alleged ORRIs with reasonable certainty is permissible under Texas law.

---

[64] *See supra* note 23.  These documents include the Consultants' respective Division of Interest Listings, Division Orders, and property tax statements of both Consultants containing corresponding information contained in the Debtor's internal pay decks reflecting the Plaintiffs' alleged ORRIs.  *Id.*

[65] ECF No. 110-13.

[66] *Id.*

[67] *Id.*

[68] ECF No. 2-2; ECF No. 2-3; ECF No. 20.  Neither the Division Orders nor Division of Interest Listings have operative words of conveyance, nor are they signed by the Debtor as grantor.  Accordingly, these documents in isolation cannot effectuate the conveyance of the Plaintiffs' alleged ORRIs.

The court in *Marrow v. Shotwell* articulated the rule governing evaluation of extrinsic evidence when contemplating satisfaction of the statute of frauds:

> The certainty of the contract may be aided by parol with certain limitations.  The essential elements may never be supplied by parol.  The details which merely explain or clarify the essential terms appearing in the instrument may ordinarily be shown by parol.  But the parol must not constitute the framework or skeleton of the agreement.  That must be contained in the writing.  Thus, resort to extrinsic evidence, where proper at all, *is not for the purpose of supplying the location or description of the land*, but only for the purpose of identifying it with reasonable certainty from the *data in the memorandum*.

477 S.W.2d at 540–41 (citing *O'Herin v. Neal*, Tex. Civ. App. 56 S.W.2d 1105, writ refused) (emphasis added).[69]

The Consulting Agreement's language that the Debtor has agreed to "set aside" certain ORRIs from within the BSR ORRI in the relevant lease begets the question of which oil and gas properties the Debtor has "set aside" interests in, and where those properties are located.[70]  The relevant Division Order or Division of Interest Listing provide those answers.[71]  The documents purport to identify those properties purely through the provision of a location or a legal description.  No data is provided in the Consulting Agreement to ascertain where the "oil and gas properties" are that the Debtor has developed "Prospects" in, and that the Plaintiffs purportedly have ORRIs in, however.  Rather, the Division Orders and Division of Interest Listing purport to provide the

---

[69] "[T]he knowledge and intent of the parties will not give validity to the contract" under the statute of frauds.  *Morrow*, 477 S.W.2d at 540.  While the Plaintiffs and Mr. Shaver may have testified as to their intent that certain ORRIs be conveyed for services the Plaintiffs rendered pursuant to the Consulting Agreement, the Court is restricted to considering the language of the Consulting Agreement and any admissible extrinsic evidence in determining whether the statute of frauds has been satisfied—not the parties' intent.

[70] ECF No. 110-13.

[71] ECF No. 2-2; ECF No. 2-3; ECF No. 20.

essential elements to effectuate the conveyance, which is prohibited under *Morrow*.  477 S.W.2d at 540–41.

Use of a location and legal description may ordinarily satisfy the statute of frauds, but satisfaction of the statute through those furnishings is reserved for the operative document effectuating the conveyance—not parol.  *Id.*  Accordingly, any ORRI whose location is identified *solely* through reference to a Division Order or Division of Interest Listing does not satisfy the statute of frauds as a matter of law.  Accordingly, summary judgment as to the conveyance of those ORRIs is granted for the Debtor and denied for the Plaintiffs.[72]

Another portion of certain alleged ORRIs listed in both Plaintiffs' Division of Interest Listing ownership profiles contain no legal description, only a line ledger denoting *inter alia* the alleged interest type and corresponding property name where the interest allegedly exists.  As stated above, this Court cannot rely on extrinsic evidence like the Division Orders of Division of Interest Listing to supply the certainty required of the Consulting Agreement.  These ORRIs do not even contain a legal description, but merely a line ledger stating a property name to identify the ORRI.  While the name of a location where the property lies may be sufficient to satisfy the statute of frauds—assuming the underlying property conveyed could be identified with reasonable certainty—it must be the *writing*, *not parol* which furnishes the data to identify the property.  *Morrow*, 477 S.W.2d at 539.  For any ORRI whose evidentiary support is *solely* a line ledger entry in either Plaintiffs' respective Division of Interest Listing, those ORRIs do not satisfy the statute of frauds as a matter of law.  Summary judgment as to conveyance of those ORRIs is granted for the Debtor and denied for the Plaintiffs.[73]

---

[72] This ruling is meant to determine the summary disposition of any ORRI that is identifiable only through reference to the Division Orders or Division of Interest Listings.  There may be some ORRIs excepted from the requirements of the statute of frauds by virtue of the Debtor having paid the Plaintiffs on account of those interests, as evidenced by various property tax records.  As discussed *infra*, the Court reserves judgment on these ORRIs for a future date.

[73] Each of the Debtor's oil and gas properties in which owners have alleged interests are listed in the Debtor's internal Division of Interest Listings.  ECF No. 2-2;

### (2)   Alleged ORRIs With Corresponding Tax Records.

Other ORRIs are supported by tax records showing amounts having been paid by the Plaintiffs to local counties where the Debtor's properties are located, on account of production revenues having been received from those alleged interests.[74]   The issue with these tax record ORRIs is whether they are excepted from the requirements under the Texas statute of frauds.   While various exceptions could have been argued, superficially the most germane exception placing parol conveyances of these ORRIs outside the purview of the statute of frauds appears to be the part-performance doctrine, as evidence of the Plaintiffs having received income on account of those ORRIs suggests a conveyance was effectuated.

"Under the [part-performance doctrine], contracts that have been partly performed, but do not meet the requirements of the [s]tatute of [f]rauds, may be enforced in equity if denial of enforcement would amount to a virtual fraud[.]" *Carmack v. Beltway Dev. Co.*, 701 S.W.2d 37, 40 (Tex. App.–Dallas 1985, no writ).   Demonstrating a "virtual fraud" requires a showing that "the party acting in reliance on the contract suffered a substantial detriment, for which he has no adequate remedy, and the other party, if permitted to plead the [statute of frauds], would reap an unearned benefit." *Id.* (citing *Texas Co. v. Burkett*, 296 S.W. 273, 279 (Texas 1927); *Matthewson v. Fluhman*, 41 S.W.2d 204, 206 (Tex. Comm'n App. 1931, jdgmt. adopted); *Davis v. Campbell*, 524 S.W.2d 790, 793 (Tex. Civ. App.–Dallas 1975, no writ)).   The partial performance must be "unequivocally referable to the agreement and corroborative of the fact that a" conveyance was effectuated. *Wiley v. Bertelsen*, 770 S.W.2d 878, 882 (Tex. App.–Texarkana 1989, no writ.) (citing *Chevalier v. Lane's Inc.*, 213 S.W.2d 530, 533–34 (Tex. 1948)).

---

ECF No. 2-3.   If one sought to ascertain a total listing of a given owner's interests in the Debtor's portfolio of leases, one could consult the Division of Interest Listing for the relevant owner.   Mr. Turner's particular Division of Interest Listing provides over one hundred different property names and corresponding interests he allegedly retains in the Debtor's various leases.   While all properties in the Division of Interest Listing contain ledgers for property names corresponding to the alleged interests, only a portion of those alleged interests contain legal descriptions of those properties.

[74] ECF No. 2-4.

Here, the Court may have grounds for finding that the payment of production revenues on account of certain of the Plaintiffs' alleged ORRIs constitutes a partial performance pursuant to the Consulting Agreement. Other exemptions to the statute of frauds might apply as well, potentially including judicial admission or estoppel. While the Debtor extensively argued the statute of frauds both in its own MSJ as well as its Reply and Response to Plaintiffs' MSJ, neither Party briefed the issue of whether any of the ORRIs were excepted from the statute of frauds under the part-performance doctrine or any other relevant exception. Rather than salvage the record to instantly adjudicate the matter, the Court will reserve judgment on the issue and request that the Parties re-brief the issues of (i) whether any exceptions to the statute of frauds applies as a matter of law and (ii) if so, whether any genuine issues of material fact exist as to which ORRIs may be excepted from that requirement.

Evidence of production revenues having been paid further highlights potential ambiguity within the Consulting Agreement—specifically with respect to Mr. Turner's claimed interests and the effect of his death thereon. The Consulting Agreement provides that "[i]n the event of the death of the Consultant, no additional ORRI are payable, except for those interests that have been already assigned to Consultant of record, which therefore pass to the beneficiaries of the Estate of Consultant, by Will or Texas state intestacy laws."[75] The Consulting Agreement also provides "[u]pon the time of Consultant's retirement or other disassociation with [the Debtor], the earned producing ORRI will be assigned to Consultant on all owned and drilled wells in any Prospects during Consultant's tenure with [the Debtor]."[76]

The Court recognizes the Consulting Agreement may be ambiguous as to whether Mr. Turner's death can be characterized as falling under the Consultant death provision or the broader Consultant "other dissociation" provision.[77] The Court's outcome on this threshold legal issue of ambiguity determines whether it may consider the Parties'

---

[75] ECF No. 110-13.

[76] *Id.*

[77] *Id.*

course of dealing—the continued payment of production revenues to Mrs. Turner on account of the alleged Turner ORRIs after his death—as relevant extrinsic evidence of the Parties' intent as to how the Consultant death and Consultant dissociation provisions should be interpreted. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983) ("A contract [] is ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning."); *Nat'l Union Fire Ins. Co. of Pitt, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 521 (Tex. 1995) ("Extrinsic evidence may, indeed, be admissible to give the words of a contract a meaning consistent with that to which they are reasonably susceptible, *i.e.*, to 'interpret' contractual terms."). Similar to applicability of exceptions to the statute of frauds, the Court will reserve judgment on the issues of ambiguity and interpretation of the Consultant death provision, and request that the Parties' re-brief each of these issues, in addition to whether any genuine issues of material fact exist as to the extent the Parties' course of dealing may affect the applicability of the Consultant death provision with respect to each claimed Turner ORRI.

### B. Whether the Consulting Agreements Show a Present Intent to Convey Real Property Interests.

The Debtor argues the Consulting Agreement cannot effectuate a valid conveyance of ORRIs because the instrument does not contain the requisite present intent to convey.[78] The language in the Consulting Agreement states that the Debtor will set aside an ORRI for the Consultant "provided that . . . deal terms allow," and if such an ORRI is not available "under deal terms, the Consultant will [otherwise] earn 50% of whatever ORRI [the Debtor] earns or retains" in the Prospect, as well as the possibility of a cash bonus.[79] According to the Debtor, the Consulting Agreement depends on future, uncertain terms, and contemplates something to be earned in the future rather than something presently transferred.[80] The Debtor argues that the term "provided that" means any right to conveyance the Plaintiffs may have

---

[78] ECF No. 110 at ¶¶ 33–37; ECF No. 112 at ¶¶ 13–14.

[79] ECF No. 110-13.

[80] *See supra* note 78.

had is subordinated or limited by "deal terms" that the Debtor's lease and derivative ORRI were subject to.[81]   According to the Debtor, testimony of Mr. Shaver and Mr. Kasino regarding the meaning of the phrase "deal terms," and the possibility that room for the Debtor's ORRI may be adjusted based on changes in the NRI of the entire prospect confirmed the possibility that future events may prohibit the Debtor from receiving the BSR ORRI (and consequently, prevent the Plaintiffs from receiving their alleged ORRIs).[82]   According to the Debtor, the Consulting Agreement does not create any affirmative rights in the Plaintiffs but rather should be read as a compensation mechanism tied to future circumstances, discretionary actions, and later transactions, rather than the present conveyance of an interest.[83]

"An instrument effects a conveyance of real property only if it contains operative words or words showing a present intent to convey title to real property." *Okumus v. Mouton*, No. 14-18-00220-CV, 2020 WL 6278664, at *5 (Tex. App.–Houston [14th Dist.] Oct. 27, 2020, no pet.) (citing *Everett v. Arreola*, No. 04-14-00259-CV, 2015 WL 1938752, at *3 (Tex. App.–San Antonio Apr. 29, 2015, no pet.)).   The Consulting Agreement states that the Debtor agrees to "set aside . . . [an ORRI] not to exceed one percent (1%) of 8/8ths out of the [BSR ORRI the Debtor] earns or retains with respect to the Prospect, effective as of the time such ORRI is earned by [the Debtor] . . . provided that, the lease burdens and deal terms allow [for the ORRI]."   To the extent an ORRI had been conveyed by oral agreement prior to or contemporaneous with execution of the Consulting Agreement, the language of the instrument "set[ting] aside" that ORRI can be construed as a present intent to convey such real property at the time of execution of the Agreement.[84]

The remaining issue is that the Consulting Agreement contains language which could be construed as contemplating future action by the Consultants which would determine whether they are entitled to additional ORRIs, and that certain ORRIs were allegedly earned by the

---

[81] ECF No. 110 at ¶¶ 43–46; ECF No. 112 at ¶ 14.
[82] ECF No. 110 at ¶¶ 43–46; ECF No. 112 at ¶ 14.
[83] ECF No. 110 at ¶¶ 34; ECF No. 112 at ¶ 14.
[84] ECF No. 110-13.

Consultants post execution of the Agreement.[85]   "Language in an instrument that contemplates future action is not language that contemplates a completed transaction in land." *Gordon v. West Houston Trees, Ltd.*, 352 S.W.3d 32, 43–44 (Tex. App.–Houston [1st Dist.] 2011, no pet. (citing *Green v. Canon*, 33 S.W.3d 855, 858 (Tex. App.–Houston [14th Dist.] 2000, pet. denied)).   While the Consulting Agreement contemplates future action by the Consultants, evidence of the Division Orders and line ledgers for the ORRIs in the Division of Interest Listing for both Consultants suggests those ORRIs may have indeed been conveyed, regardless of the future contemplative language in the instrument.   "Extrinsic evidence of intent is admissible only when an ambiguity appears on the face of the deed, in a suit for reformation, or when a party alleges fraud, accident, or mistake." *Gordon*, 352 S.W.3d at 43 (citing *CenterPoint Energy Houston Elec., L.L.P. v. Old TJC Co.*, 177 S.W.3d 425, 430 (Tex. App.–Houston [1st Dist.] 2005, pet. denied).   The same language in the Consulting Agreement providing for the conveyance of ORRIs earned prior to or contemporaneous with execution of the Agreement could be interpreted as purporting to set aside additional ORRIs for work done in the future.[86]   Therefore, the terms of the contract can reasonably be construed as contemplating either the present or future intent to convey ORRIs, which constitutes an ambiguity.   Given the extrinsic evidence of certain post-execution ORRIs potentially having been conveyed, this Court finds that the language of the Consulting Agreement contains sufficient present intent to satisfy the Texas statute of conveyances for both subsets of pre and post-execution ORRIs.

The result does not change despite the instrument conditioning conveyance on "lease burdens and deal terms," because any parol ORRI generating production revenues is necessarily one that was allowed under the relevant lease burdens, and one that necessarily had enough room under the NRI that any then-existing or hypothetical deal terms permitted such conveyance.[87]   The Debtor stipulated that no financing arrangement or term sheets were executed which would have adjusted

[85] *Id.*
[86] ECF No. 110-13.
[87] *Id.*

the NRI for the entire prospect as to extinguish the room left for the BSR ORRI.[88]

Counsel for the Debtor suggested on the record that the Consulting Agreement could not possibly effectuate the conveyance of ORRIs because the Debtor retained the authority to adjust the NRI, thereby potentially extinguishing the BSR ORRI and subsequently the Plaintiffs' ORRIs. Counsel alludes to the Consulting Agreement as an illusory contract by arguing that the obligation to convey the ORRI was essentially terminable at will, rendering the contract unenforceable. *See Light v. Centel Cellular Co. of Tex.*, 883 S.W.2d 642, 645 n. 5 (Tex. 1994) (if the obligation of a promise is terminable at will, the promise is illusory and therefore unenforceable). The logic underlying this argument is divorced from the reality of what actually transpired between the Parties, however. An ORRI purportedly set aside pursuant to the Consulting Agreement which generated production revenues was necessarily an ORRI that had enough room under the NRI. While it remained possible that the Debtor might enter into a financing arrangement that could reduce the NRI, the Debtor never did so, and proceeded under a course of purportedly setting aside ORRIs for the Consultants where room existed, and paying out production revenues on those ORRIs for producing wells. Texas courts "construe a contract to promote mutuality and to avoid a construction that makes promises illusory." *In re KSRP, Ltd.*, Case No. 10-70044, Adv. No. 10-7001, 2011 WL 13096691, at *7 (Bankr. S.D. Tex. Aug. 17, 2011). The Court declines to adopt a reading of the contract that would unwind conveyances that may have in fact occurred—as evidenced by months if not years of production revenue payouts—simply because the contract theoretically authorized the Debtor to eliminate the BSR ORRI despite it never doing so. Moreover, the language of the Consulting Agreement does not necessitate that Consultants were to be paid cash bonuses as an alternative where no room for either their alleged ORRIs or the BSR ORRI was left over.[89] Rather, those cash bonuses were left to the

---

[88] ECF No. 110 at ¶ 12.

[89] ECF No. 110-13.

discretion of the Debtor, to be received "at the time of a sale of a project or well."[90]

The language of the Consulting Agreement and extrinsic evidence of the Division Orders and Division of Interest Listings reflecting the Plaintiffs' alleged ORRIs evidence the instrument contained sufficient present intent with respect to both pre and post-execution ORRIs as to satisfy the Texas statute of conveyances for both subsets. Accordingly, summary judgment on the element of present intent is granted for the Plaintiffs and denied for the Debtor.

## II.   WHETHER THE ORRIS IN WHOLE OR IN PART COMPRISE THE DEBTOR'S PROPERTY OF THE ESTATE UNDER SECTION § 541.

The Parties present dueling arguments on whether the claimed ORRIs are excluded from the Debtor's property of the estate under various provisions of § 541.

### (A)   Whether the Alleged ORRIs are Exempted from the Debtor's Property of the Estate Under § 541(b)(4)(A).

To the extent any ORRIs may have been validly conveyed and excepted from the statute of frauds, the Plaintiffs argue those alleged ORRIs are not included in the Debtor's property of the estate under § 541(b)(4)(A).[91] Section 541(b) excludes certain property from the Debtor's estate. In particular, § 541(b)(4) exempts

> any interest of the debtor in liquid or gaseous hydrocarbons
> to the extent that–
> (A)
>> (i) the debtor has transferred or agreed to transfer such interest pursuant to a *farmout agreement* or any written agreement directly related to a farmout agreement; and
>> (ii) but for the operation of this paragraph, the estate could include the interest referred to in clause (i)

---

[90] *Id.* The Court takes no position on the issue of whether the Consultants are entitled to a cash bonus as a result of the recent sale of the substantial majority of the Debtor's assets. Case No. 24-33353 at ECF No. 972.

[91] ECF No. 86 at ¶¶ 35–40; ECF No. 89 at ¶¶ 30–36.

only by virtue of section 365 or 544(a)(3) of this title[.]

11 U.S.C. § 541(b)(4) (emphasis added).   A "farmout agreement" is defined as

> a written agreement in which–
> (A) the owner of a right to drill, produce, or operate liquid or gaseous hydrocarbons on property agrees or has agreed to transfer or assign all or a part of such right to another entity; and
> (B) such other entity (either directly or through its agents or assigns), as consideration, agrees to perform drilling, reworking, recompleting, testing, or similar or related operations, to develop or produce liquid or gaseous hydrocarbons on the property.

11 U.S.C. § 101(21A).   According to the Plaintiffs, the Consulting Agreement constitutes a farmout agreement within the meaning of § 101(21A) because the Debtor, as operator of oil and gas wells, agreed to transfer or assign a portion of its property interest to the Plaintiffs in exchange for them to "identify, generate, [and] evaluate prospects for the exploration for and development of oil and gas reserves."[92]   The Plaintiffs argue their responsibilities under the Consulting Agreement fall within the broad type of consideration contemplated in § 101(21A)(B).[93]

The Plaintiffs further argue that the legislative history of § 541(b)(4)(A) supports their interpretation.[94]  According to the Plaintiffs, the statute was intended to prevent a trustee from voiding unrecorded farmout agreements entered into with a farmee/grantee as if they were bona fide purchasers.[95]  According to the Plaintiffs, the statute was not intended to protect passive investors in drilling operations, but active participants in drilling—such as the Plaintiffs.[96]  The Plaintiffs argue that because the extent of any ORRIs conveyed were "interest[s] in

---

[92] *See supra* note 90.
[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] *Id.*

liquid or gaseous hydrocarbons" transferred pursuant to a farmout agreement within the meaning of § 101(21A), and because the Debtor has explicitly sought to avoid Plaintiffs' alleged interests as a bona fide purchaser pursuant to § 544(a)(3), those alleged ORRI interests are exempted from the Debtor's estate pursuant to § 541(b)(4)(A).[97]

The Debtor offers several convincing arguments as to why the Plaintiffs are wrong on farmout and § 541(b)(4)(A). First, the Debtor argues § 541(b)(4)(A) is *prima facie* inapplicable because the Debtor has not transferred or agreed to transfer the alleged ORRIs.[98] To the extent any ORRIs were not effectively conveyed to the Plaintiffs, the Debtor is correct that § 541(b)(4)(A) is inapplicable as a matter of law, because that provision is premised on the Plaintiffs having been transferred such "interest[s] . . . in liquid or gaseous hydrocarbons." 11 U.S.C. § 541(b)(4)(A). The Debtor further argues that § 541(b)(4)(A) is inapplicable because the Debtor sought to avoid any ORRIs that may have been validly transferred under both §§ 544(a)(3) *and* 544(a)(1).[99] Based on the analysis laid out *infra*, the Court has concluded that, to the extent any ORRIs were transferred to the Plaintiffs, those ORRIs do not constitute avoidable transfers under either §§ 544(a)(1) or 544(a)(3), and therefore the Court need not further analyze the Debtor's argument that § 541(b)(4)(A) is entirely inapplicable because multiple avoidance provisions under § 544 were cited.

The Debtor's argument regarding the inapplicability of § 541(b)(4)(A) nonetheless succeeds in its entirety because the Consulting Agreements are not farmouts within the meaning of § 101(21A). "A farmout is a common form of agreement between operators, in which a lease owner that does not want to drill assigns the lease, or some portion of it, to another operator that does. [] The primary characteristic of the farmout is the obligation of the assignee to drill one or more wells on the acreage as a prerequisite to completion of the transfer." *Young Refining Corp. v. Pennzoil Co.*, 46 S.W.3d 380, 389 (Tex. App.–Houston [1st Dist.] 2001, pet. denied) (citing 8 WILLIAMS & MEYERS, OIL AND GAS LAW,

---

[97] *Id.*

[98] ECF No. 110 at ¶ 65; ECF No. 112 at ¶ 22.

[99] *See supra* note 97.

MANUAL OF TERMS 389 (9th ed. 1994)).  Neither Consultant was assigned or transferred the right to drill, operate, or produce in any leases or wells in the Hidden Rock Field, much less acquire those rights pursuant to the Consulting Agreement.[100]  The structure and purpose of the Consulting Agreement also confirms it is not a farmout, as the Consultants did not receive consideration for undertaking the operational risks associated with drilling the Debtor's wells.[101]  The point of the Consulting Agreement was to compensate Consultants with either (i) an ORRI in the relevant Prospect, (ii) an interest in the BSR ORRI the Debtor retained in the Prospect, and/or (iii) a cash bonus upon the sale of a project or well, based on work performed and services rendered to develop those Prospects.  The standalone contract unfortunately suffers from such poor drafting as to render the ORRI conveyance mechanism ineffectual to ensure those interests were validly conveyed.  Regardless, the point of the instrument was not to compensate the Consultants for assuming the financial or operational burdens associated with drilling the Debtor's wells.  Rather, the Debtor bore those risks and paid for each cost associated with leasing, drilling, and developing the properties.[102]  Nor did the Plaintiffs perform the sort of work associated with possessing drilling rights and bearing operational risk.  Instead, the Plaintiffs' work—as the Consulting Agreement expressly provides—focused on "identif[ication], generat[ion], and evaluat[ion]" of Prospects, for the *purpose* of exploring and developing them—not the actual drilling of the wells.[103]  Indeed, Mr. Kasino described his role as an "idea" job.[104]  Both the text of the Consulting Agreement and the Plaintiffs' responsibilities for the Debtor confirm that the instrument is not a farmout.

Moreover, contrary to the Plaintiffs' assertions, the legislative history of § 541(b)(4)(A) does not support expanding application of that provision to the Consulting Agreement, as the provision was likely intended to focus on those farmees who both (i) drill wells or assume the

---

[100] ECF No. 110-14 at 164 ¶¶ 13–18.

[101] *Id.* at 65 at ¶¶ 1–3.

[102] ECF No. 110-4 at 113 ¶ 2–115 ¶ 22.

[103] ECF No. 110-13.

[104] ECF No. 110-14 at 53 ¶¶ 12–16.

rights and responsibilities of drilling a property, and (ii) have expended significant time and resources to drill or contribute to the drilling of a well.[105]   The provision was not aimed at those who merely receive compensation from others who own drilling rights and bear the risk and financial burdens associated with drilling such projects.[106]

Accordingly, on the issue of whether the ORRIs are excluded from the Debtor's property of the estate under § 541(b)(4)(A), summary judgment is granted for the Debtor and denied for the Plaintiffs.

### (B)   Whether the Alleged ORRIs Are Excluded from the Debtor's Property of the Estate Under § 541(d).

The more complicated issue is whether, to the extent any ORRIs were validly conveyed, any portion of the Plaintiffs' interest in those ORRIs is excluded from the Debtor's property of the estate under § 541(d). The Consulting Agreement provides "record title to the underlying oil and gas properties comprising any Prospect and any well located on any Prospect shall at all times remain in the name of [the Debtor], so long as [the Debtor] is operator of the property."[107]   The Plaintiffs argue that pursuant to the Consulting Agreement, the Debtor retained merely legal title to any ORRIs conveyed while the Plaintiffs retained an equitable interest.[108]   According to the Plaintiffs, the fact that the Consulting Agreement provides the Debtor shall retain "record title," while purportedly attempting to convey some form of interest in ORRIs to the Plaintiffs in the interim period prior to a sale of the properties, effectively distinguished the Debtor's ownership interest as one of bare legal title.[109]

The Plaintiffs also argue that once an ORRI was conveyed, prior to a sale of the property the ORRI was held in a resulting trust for the Plaintiffs' benefit pursuant to the Consulting Agreement, and the Plaintiffs' equitable interest in the trust res should be exempted from

---

[105]  H.R. Rep. No. 102-474, pt 7, at 8–9. (1992), *as reprinted in* 1992 U.S.C.C.A.N. 2271, 2278.

[106]  *Id.*

[107]  ECF No. 110-13.

[108]  ECF No. 86 at ¶ 35–40; ECF No. 89 at ¶ 37–44.

[109]  *See supra* note 107.

the Debtor's property of the estate under § 541(d).[110]   The Plaintiffs further argue equitable considerations should support the finding of a resulting trust: (i) the language of the Consulting Agreement purportedly contemplates this type of ORRI-conveyance transaction to begin with, (ii) the Plaintiffs are not insiders of the Debtor and control over the ultimate assignment of ORRIs rests solely with Mr. Shaver, and (iii) the Plaintiffs have had minimal involvement in the bankruptcy proceeding and little control over the Debtor's actions to date.[111]

The Debtor argues for several reasons why § 541(d) does not exclude from the estate any ORRIs that may have been conveyed.  The Debtor argues that § 541(d) only applies where the Debtor did not retain *any* equitable interest in the property.[112]   According to the Debtor, it retained both equitable and legal title to the ORRIs under the terms of the Consulting Agreement, and therefore § 541(d) is inapplicable to exclude any of the Plaintiffs' purported interests from the estate.[113] Texas courts have articulated that the concept of "equitable title" refers to the "present right to compel legal title." *Harris Cnty. Appraisal Dist. v. Primrose Houston 7 Housing, L.P.*, 238 S.W.3d 782, 787 (Tex. App.– Houston [1st Dist.] 2007, pet. denied) (citing *TRQ Captain's Landing, L.P. v. Galveston Cent. Appraisal Dist.*, 212 S.W.3d 726, 732 (Tex. App.– Houston [1st Dist.] 2006, pet. filed)).  While the phrase "present right to compel legal title" has not been expressly defined, the Debtor argues that courts look to whether a party had the ability to directly control who will have legal title through its own actions.[114]   According to the Debtor, because it retained authority to modify the room left for the BSR ORRI by adjusting the overall NRI pursuant to the EA, the Debtor was vested with both legal and equitable title to any ORRI claimed by the Plaintiffs.[115]

Moreover, the Debtor argues that at bottom, a genuine issue of material fact exists as to the extent of the Parties' respective equitable

---

[110] ECF No. 1 at ¶ 50; ECF No. 89 at ¶¶ 37–44.

[111] ECF No. 89 at ¶ 41.

[112] ECF No. 110 at ¶ 40.

[113] ECF No. 110 at ¶¶ 38–46; ECF No. 112 at 9.

[114] ECF No. 110 at ¶ 41.

[115] ECF No. 110 at ¶¶ 42–46.

interests in the claimed ORRIs, because evidence indicates that the Debtor paid property taxes on the BSR ORRIs in numerous wells the Plaintiffs allegedly had an ORRIs.[116]   With respect to the Plaintiffs' resulting trust argument,[117] the Debtor argues the essential elements of a resulting trust are absent.[118]   Namely, there has been no unjust enrichment, and the necessary intent and timing elements are absent.[119]

### *(1)*     *The Alleged ORRIs Are Not Held in a Resulting Trust.*

Texas law defines the parties' relative property interests for purposes of parsing legal and equitable interests under § 541(d).  *Haber Oil Co. v. Swinehart (In re Haber Oil Co.)*, 12 F.3d 426 (5th Cir. 1994).  "A resulting trust arises by operation of law when title is conveyed to one person but the purchase price or a portion thereof is paid by another." *Troxel v. Bishop*, 201 S.W.3d 290, 298 (Tex. App.–Dallas 2006, no pet.).  "The trust arises out of the transaction and must arise at the time when the title passes." *Cohrs v. Scott*, 338 S.W.2d 127, 130 (Tex. 1960) (quoting *Morrison v. Farmer*, 213 S.W.2d 813 (Tex. 1948)).  "The purpose of invoking a resulting trust is to prevent unjust enrichment where a person has furnished trust property or consideration and an express trust fails." *Savell v. Savell*, 837 S.W.2d 836, 839 (Tex. App.–Houston 1992, writ denied).  This Court is often presented with resulting trust theories in the context of § 541(d) as litigants typically cabin the equitable title a beneficiary may be entitled to pursuant to a resulting trust within the broader phrase "equitable interest" enumerated under § 541(d).  *See e.g. Alpine Non-Op LLC, et al. v. HB2 Origination, LLC (In re Alpine Summit Energy Partners, Inc.)*, Case No. 23-90739, Adv. No. 23-3244, 2026 WL 823740 at *6 (Bankr. S.D. Tex. Mar. 24, 2026); *Kang v. Kang (In re Kang)*, Case No. 11-36325, Adv. No. 12-3233, 2013 WL 870223, at *2–5 (Bankr. S.D. Tex. Mar. 6, 2013); *McClure et al. v. ConocoPhillips Co., (In re Reichmann Petroleum Corp.)*, Case No. 06-

---

[116] *Id.* at ¶ 46.

[117] The Debtor argues the court should ignore the Plaintiffs' resulting trust theories based on the contention that those theories were asserted for the first time in the Plaintiffs' MSJ. (ECF No. 110 at ¶ 37 n. 128.  The Plaintiffs raised their resulting trust argument in the adversary complaint.  ECF No. 1 at ¶ 50.

[118] ECF No. 110 at ¶ 47.

[119] *Id.*

20804, Adv. No. 09-2012, 434 B.R. 790, 797–98 (Bankr. S.D. Tex. Aug. 16, 2010); *In re Tex. Std. Oil Co.*, Case No. 08-34031-H4-11, 2008 WL 5479114, at *7–8 (Bankr. S.D. Tex. Nov. 12, 2008); *see also In re Haber Oil Co.*, 12 F.3d at 435–37 (interpreting § 541(d) in the context of a constructive trust).

Without opining on the extent to which unjust enrichment may be present, the Debtor is correct that the timing and transfer-of-title aspects of a resulting trust are notably absent from the factual pattern before Court. This Court was recently faced with a similar scenario in *In re Alpine*, where oil and gas investors who furnished consideration in exchange for a portion of a Texas partnership interest claimed that certain property transferred to the partnership was excluded from the debtor's estate under § 541(d) pursuant to a resulting trust theory. 2026 WL 823740 at *6. There, the debtor held marketable title to the property both before and after formation of the partnership. *Id.* This Court determined that the essential elements of a resulting trust were therefore missing, because legal title over the properties never changed hands. *Id.*

Here, the Consulting Agreement purports that "record title" will remain in the hands of the Debtor after an ORRI has been conveyed.[120] The Court must give meaning to each of the words in the contract, and use of the term "record title" must distinguish legal and equitable ownership in the ORRIs. *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006) ("To discern [the intent of the parties], we 'examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.") (citation omitted). The plain meaning of the term "record title" most readily equates with the concept of legal or marketable title. Therefore, the Consulting Agreement purports that upon the completion of work by a Consultant, an ORRI is conveyed to the Consultant, and she retains some form of equitable interest in the ORRI, while legal title remains in the hands of the Debtor pending the ultimate sale of the property. Once such a sale is consummated, legal title then shifts over to the Consultant under the

---

[120] ECF No. 110-13.

31 / 48

plain terms of the agreement.  Legal title does not shift, however, prior to the consummation of such a sale.  Therefore, no resulting trust could have been formed for the benefit of a Consultant at the moment an ORRI was earned because legal title never shifted from one person to another; legal title was always in the hands of the Debtor.  Moreover, at the time of the MSJ Hearing no sale had been consummated as to require transfer of legal title of the alleged ORRIs from the Debtor to the Consultant.[121]  Accordingly, the Plaintiffs' resulting trust claims over the ORRIs fails a matter of law.

> ### *(2)     To the Extent Any ORRIs Were Validly Conveyed, the Plaintiffs' Equitable Interest in that Property is Excluded From the Debtor's Estate Under § 541(d).*

The text of § 541(d) provides

> property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) [] of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d).  Conversely, § 541(a)(1) provides "[e]xcept as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case" constitutes property of the debtor's estate.  11 U.S.C. § 541(a)(1). Accordingly, § 541(d) not so much articulates a categorically distinct rule from § 541(a)(1), but more so clarifies that non-minimal equitable interests the debtor retains as of the commencement of the case fall within the estate, while minor interests—such a lien or bare legal title— are excluded.  *See U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 n. 8 (1983).  Accordingly, § 541(d) in conjunction with § 541(a)(1) operate to exclude property from the debtor's estate only where the debtor has

---

[121] While ORRIs and working interests are generally included as assets under the "Lot 2 APA" (ECF No. 935; ECF No. 935-1), those ORRIs the Court determines are valid and enforceable and are not subject to avoidance or are otherwise unenforceable are expressly carved out from Lot 2 as "Excluded Assets."  ECF No. 933 at 16 ¶ 2.3(i).

minimal to no equitable interest in the property. *Id.* To the extent the debtor has "more than a 'minimal' equitable interest, the property *in its entirety* is property of the debtor's estate." *In re Leff*, 88 B.R. 105, 108 (Bankr. N.D. Tex. 1988) (emphasis added). To be sure, the United States Supreme Court expressly clarified that §§ 541(d) and 541(a)(2) were not meant to "limit the ability of a trustee to regain possession of property in which the debtor had equitable as well as legal title." *Whiting Pools*, 462 U.S. at 204 n. 8.

Much like with resulting trust theories, this Court is often faced with § 541(d) determinations in the context of "legal title" and "equitable title" splits. *See e.g. In re Alpine*, 2026 WL 823740 at *8; *In re Kang*, 2013 WL 870223, at *5–7; *In re Reichmann Petroleum Corp.*, 434 B.R. at 797–98; *In re Tex. Std. Oil Co.*, 2008 WL 5479114, at *7, *10. As noted above, Texas courts define the term "equitable title" as the "present right to compel legal title." *Primrose Houston 7 Housing, L.P.*, 238 S.W.3d at 787 (citing *TRQ Captain's Landing, L.P.*, 212 S.W.3d at 732). It is undoubted that under the plain terms of the Consulting Agreement, the Plaintiffs do not possess the present right to compel legal title to any ORRIs that may have been conveyed to them.[122] Legal title remained in the hands of the Debtor, vesting in the Plaintiffs upon a consummation of the sale of the underlying oil and gas property or the Consultant's dissociation with the Debtor.[123]

Section 541(d) does not limit its exclusion effect to instances where a party has "equitable title" over property but instead uses the broader and undefined term "equitable interest." 11 U.S.C. § 541(d). In the Court's view the relevant inquiry under § 541(d) is not limited to whether the Plaintiffs had sufficient equitable *title* over the ORRIs, but rather whether the Plaintiffs had the necessary equitable *interest*. To the extent any ORRI may have been conveyed to the Plaintiffs, it cannot be said they retained no equitable interest in that property within the meaning of § 541(d). *See In re Alpine*, 2026 WL at *3 n. 4 ("An 'equitable interest' is an interest held by virtue of an equitable title *or claimed on equitable grounds*[.]") (internal citation omitted). This Court need not

---

[122] ECF No. 110-13.

[123] *Id.*

articulate the boundary and scope of that equitable interest, but to the extent an ORRI was in fact conveyed, the Plaintiffs retained a certain bucket of rights in that property despite not possessing legal title or the present right to compel it.  For example, that bucket may include the right to receive overriding royalty interest payments, the right to acquire legal title pending the sale of the underlying property within which the ORRI derived from, or the right to assign those interests to a third party for consideration.  Moreover, the legislative history of § 541(d) evidences an intention to limit in the hands of the estate interests which were limited in the hands of the debtor.  H.R. Rep. No. 95-595, pp. 6323–24, 6455 (1977);[124] *In re Montreal, Maine & Atlantic Railway, Ltd.*, 888 F.3d 1, 65 Bankr. Ct. Dec. (CRR) 143 (1st Cir. 2018).  Under the plain terms of the Consulting Agreement, conveyance of an ORRI carved out certain rights from the Debtor's interest in the underlying properties and respective BSR ORRI and assigned those rights to a Consultant.  Consistent with § 541(d), § 541(a)(1) and *Whiting Pools*, to the extent the Debtor retained a minimal interests in the ORRIs—such as bare legal title—the Plaintiffs respective equitable interest would remain in their hands upon commencement of the case.  The fact that the overall NRI could have been adjusted to effectively eliminate the Plaintiffs' alleged ORRIs would not negate any transfer that had previously occurred.  Indeed, no direct evidence was introduced to indicate that no

---

[124] "Though paragraph [541] will include choses in action and claims by the debtor against others, it is not intended to expand the debtor's rights against others more than they exist at the commencement of the case.  For example, if the debtor has a claim that is barred at the time of the commencement of the case by the statute of limitations, then the trustee would not be able to pursue that claim, because he too would be barred.  He could take no greater rights than the debtor himself had. . . . Section 541(d) of the House Amendment is derived from section 541(e) of the Senate Amendment and reiterates the general principle that where the debtor holds bare legal title without any equitable interest, that the estate acquires bare legal title without any equitable interest in the property.  Examples of this are mortgages sold for which legal title has been retained for servicing.  Similarly, if the debtor holds an equitable interest in property without legal title, the estate would acquire only the equitable interest of the debtor in property and not the legal title.  Thus, as section 541(a)(1) clearly states, the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case.  To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate except to the extent that defenses which are personal against the debtor are not effective against the estate." *Id.*

room was left for the BSR ORRI in any particular property under any pending deal, and the Court declines to opine on the nature of the Plaintiffs' interest in the alleged ORRIs if said hypothetical deal had been consummated.

The Plaintiffs therefore have a legal claim to their equitable interest in the ORRIs as a matter of law, but the Debtor claims factual issues remain as to the extent of its own equitable interest in the same. Not so. The testimony of Mr. Katchadurian, Chief Restructuring Officer of the Debtor, indicates the Debtor was paying property taxes on account of various BSR ORRIs corresponding to certain underlying properties the Plaintiffs claim ORRIs in.[125] The Debtor having paid property taxes on account of the *BSR ORRI* in the underlying properties the Plaintiffs claim ORRIs in does not raise genuine issues of material fact as to the extent of the *Debtor's* interest in the *Plaintiffs'* alleged ORRIs *carved out* of the BSR ORRI pursuant to the Consulting Agreement. The Plaintiffs' alleged ORRIs were carved out of the BSR ORRI, and the Debtor retained bare legal title to those property interests. While the Debtor could have adjusted the NRI for the entire prospect, thereby potentially extinguishing the BSR ORRI, it did not do so prior to the Involuntary Petition Date; it did not enter into any financing arrangement pursuant to any contemplated term sheet which may conveyed additional ORRIs to investors. The Debtor's interest in the Plaintiffs' alleged ORRIs was therefore minimal and excluded from property of the estate under § 541(d). *Whiting Pools, Inc.*, 462 U.S. at 204 n. 8. Accordingly, summary judgment is granted for the Plaintiffs and denied for the Debtor on the issue of whether the Plaintiffs' interest in the ORRIs are excluded from the Debtor's estate under § 541(d).

---

[125] ECF No. 110-17. According to the testimony of Mr. Katchadurian, these properties include *inter alia* Allen #1, Kerr #1, Winne #1, Sturdivant #1, Templeton Bridge #1H, Anderson #1, Goodhart #1, Grubbs #1, Goode-McMahan #1H, Bray #1, Ayers-Keasler #1H, Owens #1, Hays-Campbell #1H, MCD #1, Rhyne #1, Templeton Goodson #1H, Thornton #1, Ayers-Humphrey #1H, McFarlane-Alford #1H, Forest #1, Wilemth-Wren #1H and Mitchell #1." *Id.*

III.   **WHETHER THE ALLEGED ORRIS ARE AVOIDABLE TRANSFERS RECOVERABLE UNDER § 550.**

The final issue is whether, to the extent any ORRIs were transferred to the Plaintiffs, those ORRIs constitute avoidable transfers under (i) §§ 544(a)(1) or (a)(3), or (ii) § 548(a)(i)(B), recoverable by the trustee under § 550(a).  The Court will first address §§ 544(a)(1) and 544(a)(3) and the issue of whether a trustee would have been on notice of the Plaintiffs' alleged interest in the ORRIs.  Then, the Court will address § 548(a)(i)(B) and whether the alleged ORRIs may have been transferred for reasonably equivalent value.

**(A)   Whether the ORRIs Constitute Avoidable Transfers Under §§ 544(a)(1) or (a)(3).**

*(1)   Section 544 and Inquiry Notice under Texas law.*

Section 544 provides

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists; [or]

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a)(1), (3).  The Court in *In re Hamilton* laid out § 544 and its interaction with applicable non-bankruptcy law succinctly.  125 F.3d 292, 299–300 (5th Cir. 1997).

> Section 544(a)(3) allows the avoidance of a transfer of real property that is not perfected and enforceable against a bona fide purchaser at the time the bankruptcy petition is filed. [] While the Bankruptcy Code creates the status of a hypothetical bona fide purchase, state law defines that status. [] Under Texas law, a "bona fide purchaser is one who acquires (apparent) legal title to property in good faith for a valuable consideration without . . . notice of an infirmity in the title." [] A conveyance of an interest in real property . . . is void as to a subsequent purchaser if the interest was not recorded at the time of the subsequent purchase and the purchaser paid valuable consideration without notice of the unrecorded interest.  *See* TEX. PROP. CODE. ANN. § 13.001(a). []

*Id.* (citations omitted); *see also* TEX. PROP CODE § 5.021.[126]

The Parties largely agree that no actual or constructive notice of the Plaintiffs' alleged ORRIs could have been attained because those interests were not recorded in the real property records of the relevant counties comprising the Hidden Rock field, and no chain of title exists with respect to those interests.[127]  The Parties' arguments therefore hinge on the Court's determination of whether a hypothetical purchaser or lien creditor would have been on inquiry notice of the Plaintiffs' alleged ORRIs.  In the Court's view, the answer to that question is yes.

---

[126] As noted above, in its papers the Debtor cites § 544(a)(1) in passing but never briefs the issue nor addresses why a trustee would be able to avoid the Plaintiffs' alleged interests under that provision.  Regardless, the Court understands that resolution of both subsections (a)(1) and (a)(3) depends on whether a hypothetical purchaser or lien creditor would be on notice of the Plaintiffs' alleged ORRIs as of the Involuntary Petition Date, on account of their tax information being recorded in the local county tax records for the relevant properties.  Accordingly, a distinct (a)(1) and (a)(3) analysis is not necessary, more particularly because, as noted below, the Court has concluded that a hypothetical purchaser or lien creditor would have been on inquiry notice of the Plaintiffs' alleged ORRIs, thereby defeating any avoidance claim the Debtor may possess (to the extent payment on account of such ORRIs was evidenced in the county tax records).

[127] ECF No. 86 at ¶ 33.

### (2)   The Trustee as a Hypothetical Purchaser or Lein Creditor Would Have Been on Inquiry Notice of the Plaintiffs' Alleged Interest in the ORRIs.

The Plaintiffs argue that evidence of their alleged ORRIs filed in the local county tax records would lead a reasonably prudent inquirer to investigate further into the Debtor's underlying oil and gas properties, which would in turn reveal the Plaintiffs' claimed interests in the Debtor's internal documents, thereby negating bona fide purchaser status with respect to those interests.[128]   The Plaintiffs also argue a reasonably prudent purchaser is necessarily one who knows the standards of the oil and gas industry or the real property acquisition industry generally, and that records of ad valorem tax payments would be reviewed as part of the title examination standards under the Texas Property Code.[129]   According to the Plaintiffs, the existence of inquiry notice in the instant case is buttressed by evidence of industry participants having discovered the Plaintiffs' alleged ORRIs through the county tax records, and those participants having provided the Plaintiffs with unsolicited offers to purchase those interests.[130]

According to the Debtor, the applicable standard for determining whether the trustee would have been on constructive or inquiry notice of the ORRIs is limited to what a reasonable investigation of the recorded chain of title would reveal.[131]   The Debtor argues that because no interests were recorded in the real property records of any county for any property, then nothing would place a trustee on notice of the alleged ORRIs or prompt further inquiry into their existence.[132]   The Debtor argues that even under the assumption a hypothetical purchaser or lien creditor had some inquiry notice based on the tax records, Mr. Shaver's history of refusing to disclose information regarding the Plaintiffs' or other investors' interests to third parties would have negated the possibility of such hypothetical purchaser or lien creditor acquiring

---

[128] *Id.* at ¶¶ 28–34; ECF No. 89 at ¶¶ 45–51; ECF No. 113 at ¶¶ 9–12.

[129] *See supra* note 127.

[130] *Id.*

[131] ECF No. at 19 ¶¶ 21–33; ECF No. 110 at ¶¶ 55–63; ECF No. 112 at ¶¶ 15–20.

[132] *See supra* note 130.

further information regarding the Plaintiffs' alleged interests in the ORRIs, thereby negating the establishment of inquiry notice.[133]   The Debtor also argues that Texas courts do not determine notice based on industry practices and urges the Court not to recognize such a proposed rule in the instant case as a matter of policy.[134]

> Texas law recognizes the doctrine of inquiry notice, triggered by notice of facts that would put a reasonably prudent person on a duty of inquiry. []
>
> A hypothetical purchaser on inquiry notice is *chargeable with implied knowledge* of facts that *would be discovered* by a reasonably diligent inquiry. []
>
> The duty of inquiry is governed by standards of reasonableness, extending to "those things which a reasonably diligent inquiry and exercise of the means of information at hand would have discovered."

*In re Hamilton*, 125 F.3d at 300 (citations omitted) (emphasis added).

The first issue is whether the Plaintiffs' information regarding production revenues and tax payments in the local county tax records would been discovered by the trustee through a reasonably diligent inquiry. *See id.* at 300.  If the answer to that question is yes, the next issue is whether knowledge (actual or implied) of those tax records constitutes sufficient inquiry notice under Texas law as to negate the trustee's hypothetical bona fide purchaser status.

Here, the Court is of the view that a reasonably diligent inquiry would have discovered the tax records evidencing the Plaintiffs' alleged ORRIs.  The Court does not necessarily disagree with the Debtor's contention that Texas courts do not *require* purchasers to search civil dockets for judgments, litigation, or divorce decrees to determine whether real property interests have been conveyed.  *Woodward v. Ortiz*, 237 S.W.2d 286, 289 (Tex. 1951).  "The determination of whether a purchaser may be charged with [implied knowledge of the Plaintiffs'

---

[133] *Id.*
[134] *Id.*

alleged ORRIs] depends on the facts of each case," however, and therefore this Court need not articulate or contravene established rules in order to conclude a hypothetical purchaser would have implied knowledge of the tax records here. *Id.* at 301. It is true the Plaintiffs do not cite any authority for the narrow proposition that tax records outside the chain of title are within the realm of reasonable diligence as to charge a trustee with implied knowledge of their contents. The Court's task is not to synthesize and apply a new rule with respect to tax records outside the chain of title, however, but rather to apply *Hamilton* and the Texas standard for what a hypothetical trustee under these circumstances would have discovered through a reasonably diligent inquiry, exercising the means of information at hand. 125 F.3d at 300; *Woodward*, 237 S.W.2d at 289.

Checking tax records is not necessarily *outside* the boundaries of what a reasonably diligent inquiry would reveal—rather, discovering that information is beyond what the Debtor believes the Court may saddle the trustee with under the circumstances. *See Teofan v. Cools (In re Spring Creek Invs.)*, 71 B.R. 157, 159–60 (Bankr. N.D. Tex. 1987) ("the duty [of a reasonably diligent search] does not extend to exhaustive inquiry or investigation of speculation and conjecture"). While true "information at hand" is generally thought of as information contained within the chain of title, it strains credulity to postulate that a hypothetical purchaser of a commercial oil and gas property, containing several open and observable wells and drilling operations spanning across multiple counties would not, through reasonably diligent inquiry by either themselves or a title examiner exercising such diligent inquiry, discover tax records indicating the interests of third parties in at least one of those properties. *See* Tex. Prop. Code tit. 2 app., Title Examination Standard 15.70 ("[T]he examiner should ordinarily determine the status of payment of ad valorem taxes" and if she does not, should "advise the client to make this determination[.]"); *but see* Tex. Prop. Code tit. 2 app., Title Examination Standard 1.20 ("[T]he title examiner is ordinarily examining *only record title*" but "matters not evident from the materials examined" including "production tax liens" and "liens for ad valorem taxes *not yet due*" *may* constitute a "risk or circumstance that affects title[.]") (emphasis added). The Court is

assured of its conclusion based on the facts presented here because the record indicates third party purchasers did in fact have notice of the Plaintiffs' alleged ORRIs based on the information in the county appraisal district records and used that information to solicit the Plaintiffs offers. Therefore, in the Court's view, a trustee would have implied knowledge as to the Plaintiffs' production revenues and tax payments based on the records located in the tax filings. *In re Hamilton*, 125 F.3d at 300.

> "[A] purchaser is bound by every recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims . . . . The rationale of the rule is that any description, recital of fact, or reference to other documents puts the purchaser upon inquiry, and he is bound to follow up this inquiry, step by step, from one discovery to another and from one instrument to another, until the whole series of title deeds is exhausted and a complete knowledge of all the matters referred to and affecting the estate is obtained."

*Id.* (citing *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 908 (Tex. 1982) (internal citations omitted)). The next logical assumption is the hypothetical purchaser would "follow up this inquiry, step by step, from one discovery to another and from one instrument to another," until the purchaser contacted the Debtor itself, verified whether the Plaintiffs' interests were reflected in the Debtor's internal documents, and ultimately acquire notice of the Plaintiffs' alleged ORRIs. *Id.* The tension with this assumption is that the typical charge of inquiry notice is in the context of instruments within the chain of title. A tax record is not an instrument within the chain of title. Rather, the tax records in this instance evidence another party receiving income and paying property taxes on account of their unspecified interest. For purposes of inquiry notice, knowledge of the tax records would function similarly as an instrument within the chain of title—indicating that another party may possess an interest in the given property. Therefore, extending the charge of inquiry notice "up the chain" of instruments from the tax records to the Debtor's internal documents is consonant with the rational underlying the same rule applied to charges of inquiry

41 / 48

notice up the chain of title.  The policy of the doctrine is to charge a hypothetical purchaser with "complete knowledge of all [] matters referred to and affecting the estate" that could reasonably be acquired from "any description, recital of fact, or reference to other documents" known to that purchaser which may affect marketable title.  *Id.*

The Court is not convinced by the Debtor's argument that no inquiry notice of the Plaintiffs' alleged ORRI could have been conferred based on Mr. Shaver's testimony that he would refuse to speak to third-party inquiries regarding the extent of ownership interests in his oil and gas properties.  The Debtor itself filed the Plaintiffs' information in the tax records which are publicly accessible, would necessarily be accessed prior to the consummation of a sale of the land, and were likely accessed to acquire the Plaintiffs' alleged ownership information for the purpose of soliciting them offers.  A reasonably diligent inquiry would have revealed the Plaintiffs' alleged ORRIs in the tax records, and further inquiry into the Debtor's internal pay decks, Division Orders, and Division of Interest Listings would have confirmed the existence of the Plaintiffs' alleged ORRIs as to put a hypothetical purchaser on inquiry notice.  Accordingly, summary judgment on the issue of whether the alleged ORRIs are avoidable transfers under §§ 544(a)(1) or (a)(3) is granted for the Plaintiffs and denied for the Debtor.

Arguments with respect to whether § 541(d) overrides § 544(a) are moot because the Court has already made the determination that § 544(a) does not enable the trustee to avoid the alleged transfer of ORRIs.

### (B)     To the Extent the ORRIs Were Conveyed, it is Undisputed Subsequent Production Revenues Were Transferred for Reasonably Equivalent Value.

The final issue is whether the Debtor may clawback approximately $1.6 million in production revenues transferred to the Plaintiffs on account of their alleged ORRIs within two years of the involuntary petition date, and conversely whether the Plaintiffs are entitled to summary judgment as to their affirmative defense that the ORRI payments were for reasonably equivalent value.[135]  Based on the

---

[135] The Debtor did not raise the issue of reasonably equivalent value in its partial motion for summary judgment, but the Plaintiffs raised the issue as an

analysis below, the Court grants summary judgment on the Plaintiffs' affirmative defense.

### (1)     Section   548(a)(1)(B)   and   Texas   Constructive Fraudulent Transfer Law.

Under § 548(a)(1)(B)

> [t]he trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily . . . received less than a reasonably equivalent value in exchange for the transfer . . .; and . . . was insolvent on the date that such transfer was made . . ., or became insolvent as a result of such transfer . . .; was engaged in business . . . for which any property remaining with the debtor was an unreasonably small capital; intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; [or] made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B)(i), (ii)(I)–(IV).  "[R]easonably equivalent value" under § 548 means that "the debtor has received value that is substantially comparable to the worth of the transferred property."  *In re TransTexas Gas Corp.*, 597 F.3d 298, 306 (5th Cir. 2010) (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 548 (1994)).  "The value of consideration given for a transfer alleged to be in fraud of creditors is determined from the standpoint of creditors on the date of the transfer." *U.S. v. Loftis*, 3:06-CV-1633-P, 2009 WL 10678612, at *6 (N.D. Tex. Mar. 5, 2009) (internal quotation marks omitted), *aff'd*, 607 F.3d 173 (5th Cir. 2010).

---

affirmative defense to the Debtor's Counterclaim in their own summary judgment motion.  Therefore, adjudication of reasonably equivalent value as an affirmative defense to the Debtor's constructive fraudulent transfer counterclaim is ripe for review. In total, the Debtor alleges Mr. Kasino received $963,705.47 for his alleged ORRIs, and Mr. Turner received $651,168.36 for his alleged ORRIs during the two-year period prior to the Involuntary Petition Date.  ECF No. 24 at ¶ 15.

Under the Texas Uniform Fraudulent Transfer Act (hereinafter "TUFTA"), an asset transferred with actual or constructive intent to defraud any creditor may be reclaimed for the benefit of the transferor's creditors unless the transferee took the asset in good faith and for a reasonably equivalent value. *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 562 (Tex. 2016); TEX. BUS. & COM. CODE §§ 24.005(a)(2), 24.009(a). "Value" for purposes of TUFTA "exists when the debtor took consideration that had objective value at the time of the transfer, even if the consideration neither preserved the debtor's estate nor generated an asset or benefit that could be levied to satisfy unsecured creditors." *Golf Channel*, 487 S.W.3d at 577. "The reasonably equivalent value requirement in [§] 24.009(a) [of TUFTA] is [] satisfied if a transferee performs objectively valuable services or transfers goods in an arm's-length transaction at market-value rates." *Id.* In order for the Debtor to succeed on its constructive fraudulent transfer claims under either the Bankruptcy Code or TUFTA, there must be a showing that the Debtor received less than reasonably equivalent value from the Plaintiffs in exchange for the ORRI payments made within the two years leading up to the Involuntary Petition Date. Conversely, the Plaintiffs must demonstrate reasonably equivalent value was received by the Debtor in exchange for the ORRIs and production revenue payments.

### *(2)  The Alleged ORRIs and Production Revenue Payments Were Transfers for Reasonably Equivalent Value Under the Terms of the Consulting Agreement.*

The Debtor proposes three arguments in its Counterclaim with respect to reasonably equivalent value.[136] First, the Debtor questions the value of Mr. Kasino's services in comparison to Mr. Turner's, based on allegations that Mr. Turner, not Mr. Kasino, discovered the Hidden Rock field.[137] Second, the Debtor contends that both Plaintiffs received more than the reasonably equivalent value of their services because in addition to their salaries and bonuses under the Consulting Agreement, they received approximately $1.6 million in ORRI payments within two

---

[136] ECF No. 24 at ¶ 40–46.
[137] *Id.*

years of the involuntary petition date.[138]  Third, the Debtor argues that value could not have been conferred by Mr. Turner during the relevant period of time following his death on March 31, 2024, where no geological services were rendered.[139]  The Debtor also argues the Plaintiffs have not met their burden of proof because they did not submit competent summary judgment evidence with respect to whether the ORRI payments were for reasonably equivalent value.[140]

The Plaintiffs argue the ORRI payments were transferred in exchange for reasonably equivalent value because both Plaintiffs had market rates as geologists that far exceeded their salary under the Consulting Agreement.[141]  Specifically with respect to Mr. Kasino, the Plaintiffs argue the value of his work alone in the 10 years leading to him receiving "any upside" under the split compensation program conferred on the Debtor in excess of $1.8 million, which offsets the approximately $1.6 million in ORRI payments the Plaintiffs received two years before the Involuntary Petition Date.[142]

The proper framing for the § 548 inquiry is not to observe whether the Consultants conferred reasonably equivalent value on the Debtor each time an ORRI payment was distributed after it was earned, but rather whether the present value of the ORRIs' future earning potential was reasonably equivalent to the value of the Consultants' services conferred to the Debtor at the time the Consultants performed those services.

The language of the Consulting Agreement provides that upon the performance of services by the Consultant to help develop the Prospects, the Debtor would "set aside" an ORRI for the Plaintiffs. Earning an ORRI pursuant to the Consulting Agreement functioned both as a compensation mechanism and as an incentive to encourage Consultants to undergo more work and acquire more ORRIs in Prospects.  Much like being compensated with company stock, the

---

[138] *Id.*

[139] *Id.*

[140] ECF No. 110 at ¶¶ 69–70.

[141] ECF No. 89 at ¶¶ 55–55.

[142] *Id.*

Consulting Agreement had potential upside and potential downside risk for the Consultants. Accordingly, the "value" of the work performed by the Consultant to earn the ORRI was equivalent to the present value of that ORRI's earning potential in the future at the time the Consultant performed that work. Indeed, that was the entire point of the split compensation structure under the Agreement. When analyzing value conferred to the Debtor under the terms of the relevant contract which purportedly conveyed the ORRIs, it becomes clear that the value of the Consultants' services were necessarily comparable to the worth of the ORRIs conveyed—worth which included the potential upside of distributing future production revenues. *See BFP v. Resolution Trust Corp.*, 511 U.S. at 548 (interpreting value within the meaning of § 548 as being affected by the market in which the property is transferred). The plain terms of the Consulting Agreement contour the value of the ORRI as commensurate with the value of the Consultant's services at the time those services are rendered. With respect to ORRI payments transferred to the Plaintiffs' within the two-year lookback period for constructive fraudulent transfers under § 548, the equivalent value of that transfer was already captured when the Plaintiffs' conferred their services to the Debtor pursuant to the Consulting Agreement.

The final inquiry remains whether the Plaintiffs provided competent summary judgment evidence to support the contention they performed objectively valuable services in an arms'-length transaction at market-value rates. Important to reiterate is that the Court's inquiry is not necessarily to determine whether the aggregate sum of ORRI payments transferred to the Plaintiffs within the two-year lookback period is reasonably equivalent to the value of the Plaintiffs' services conferred to the Debtor to earn those ORRIs, but rather whether the value of the Plaintiffs' services was reasonably equivalent to the present value of that ORRI—including its future earning potential—at the time the ORRI was allegedly earned. Mr. Kasino's testimony with respect to his salary at BP supports a finding that the market-value for his rate was $300,000 prior to his retirement. That the market value of Mr. Kasino's services may have been in excess of $300,000 does not prove the Plaintiffs' proposition that the Debtor "received, at minimum, approximately $1.8 million in excess value from Mr. Kasino's

contributions alone." Indeed, the logic underlying such an assumption appears to be that the Plaintiffs simply multiplied the market value of Mr. Kasino's services by the number of years he worked for the Debtor (10 years) and then subtracted from that sum his annual salary of $120,000 for each of those 10 years.

Highlighting the proposed value conferred by Mr. Kasino's services for those 10 years instead illustrates the underlying point the Court discussed with respect to the compensation scheme under the Consulting Agreement and present value of the ORRIs at the time of conferral. Working for the Debtor under the Consulting Agreement meant that Mr. Turner and Mr. Kasino, both individuals whose market rate as geologists was in excess of $250,000,[143] agreed to a significantly reduced salary in exchange for the potential upside of acquiring ORRIs from the Prospects they helped develop. No party contends either Consultant failed to render objectively valuable services for the Debtor in assisting with the development of Prospects. Moreover, conferral of ORRIs to employees of an oil and gas company is a typical market practice within the industry. Therefore, the value of the Plaintiffs' work for the Debtor was reasonably equivalent to the value of alleged ORRIs received, including those ORRIs future earning potential. *Golf Channel*, 487 S.W.3d at 577.

In sum, the Court finds no facts in dispute as to whether the ORRIs were transferred for reasonably equivalent value. Because the Debtors cannot bear the burden of proving their constructive fraudulent transfer claims under § 548(a)(1)(B) and TEX. BUS. COM. CODE § 24.005(a)(2), then to the extent any ORRIs were conveyed, summary judgment is granted as to Plaintiffs' affirmative defense.

---

[143] Testimony of Mr. Shaver indicates his understanding that prior to working for the Debtor, both Consultants individually earned approximately $250,000 per year for their work as geologists. ECF No. 89-1 at 137 ¶ 18–138 ¶ 11.

## CONCLUSION[144]

For the foregoing reasons, the Court grants in part and denies in part both Parties' MSJs.

Within 21 days after entry of this Opinion, counsel for both Parties are directed to re-brief the narrow issues of (i) whether any of the Plaintiffs' alleged ORRIs are excepted from the Texas statute of frauds, (ii) if so, whether any genuine issues of material fact exist with respect to those ORRIs, (iii) whether the Consultant death provision in the Consulting Agreements is ambiguous, and (iv) if so, what effect the Parties' course of conduct in paying Mrs. Turner production revenues after the death of Mr. Turner has on enforcement of the Consultant death provision.  Any responses are due 7 days after the re-briefing.

Once the issues are fully re-briefed, the Court will issue a subsequent ruling on the remaining matters in the Parties' MSJs.

SIGNED 05/18/2026

Alfredo R Pérez
United States Bankruptcy Judge

---

[144] This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.